# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

ReMAPP INTERNATIONAL CORP.,

        **Plaintiff,**

        **v.**                            **Case No. 07-C-287**

COMFORT KEYBOARD COMPANY, INC.,

        **Defendant.**

---

## DECISION AND ORDER FOLLOWING COURT TRIAL

---

On March 23, 2007, ReMapp International Corporation ("ReMapp") filed a complaint alleging that Comfort Keyboard Company, Inc., ("Comfort Keyboard") breached a contract and has not paid for goods it ordered. Comfort Keyboard subsequently filed an amended answer containing a counterclaim for breach of contract, breach of implied warranty, and breach of express warranty. After a referral for mediation to Magistrate Judge Patricia J. Gorence did not result in a resolution of the dispute between the parties, the court conducted a court trial on May 15, 2008. Following the court trial, the parties submitted post-trial briefs. The matter is ready for resolution.

**FINDINGS OF FACT**

ReMapp is a company that provides contract manufacturing services of electronic materials, particularly printed circuit boards. (Tr. 4.) Hal Edmonds, the only witness to testify on behalf of the plaintiff, is ReMapp's president. (Tr. 4.) ReMapp partners with factories in China to manufacture printed circuit boards, nearly all of which are custom made. (Tr. 5.) Comfort Keyboard, which is owned by Charles Afifi who testified on the defendant's behalf, manufactures ergonomic computer keyboards and other computer peripherals to assist persons with disabilities in using computers. (Tr.

112, 124.) Over approximately six or seven years, Comfort Keyboard repeatedly purchased electronic components from ReMapp. (Tr. 16, 19.) Initially, Comfort Keyboard would submit written purchase orders, but as the parties became more familiar with each other, it became common practice for Comfort Keyboard to simply call ReMapp and request a quantity of products. (Tr. 16, 26.) Initially, after Comfort Keyboard placed an order, ReMapp generated a pro forma invoice that detailed what the final costs would be and outlined the payment terms. (Tr. 30.) ReMapp, in the early years of the relationship, required Comfort Keyboard to pay 50% of the order amount at the time ReMapp sent the pro forma invoice, and the final 50% was due at the time the order was ready to be shipped. (Tr. 17-18.) Later, the payment terms changed so that Comfort Keyboard was required to pay 50% at the time of the order and the remaining 50% within 30 days of receipt of the product. (Tr. 18.) However, on certain orders, ReMapp required full payment up front, in which case a pro forma invoice would not be generated. (Tr. 62-63, 115-16.)

During the course of their relationship, certain of the products that Comfort Keyboard received from ReMapp were defective, (Tr. 20). For example, components were improperly programmed (Tr. 20), or incorrect components were utilized on the boards (Tr. 68-69). When incorrect components were used on these boards, Comfort Keyboard was required to engage in a time consuming process of hand-soldering the correct component onto the board. (Tr. 108-10.) Comfort Keyboard never formally requested to return these defective products, (Tr. 19), but ReMapp did occasionally offer Comfort Keyboard credits for products. (See, e.g., 26, 1015.)

In April of 2006, Comfort Keyboard called ReMapp and placed an order for 1,000 USB keyboards. (Tr. 25.) On May 19, 2006, ReMapp emailed Comfort Keyboard a pro forma invoice. (Exhibits 18, 1037.) Comfort Keyboard replied 1 ½ hours later "YOU ARE THE BEST ……. GREAT NEWS… "THANK YOU "[.]" (Exhibit 19.) ReMapp began fabrication of these 1,000

2

units, and in July of 2006 Comfort Keyboard called ReMapp and doubled this order to 2,000 units. (Tr. 25-26.)

Also during this time period, in May of 2006, Comfort Keyboard called and placed an order for 1,000 "HUB" units, which Comfort Keyboard doubled by way of a phone call in July, 2006. (Tr. 26-27.)

Each of these devices required a processor that was known to fluctuate in cost. (Tr. 28-29.) In the past, Comfort Keyboard provided this processor to ReMapp, but because Comfort Keyboard no longer had any available, Comfort Keyboard asked ReMapp to purchase the processor if ReMapp could find it for under $6.00. (Tr. 29-30.) ReMapp found the processor for $5.85 and after verbally confirming with Comfort Keyboard that this price was acceptable, ReMapp purchased 4,100 of these processors on Comfort Keyboard's behalf (the additional 100 units were for backordered items Comfort Keyboard had previously requested). (Tr. 30; Exhibits 26, 1015 at 2.)

On July 19, 2006, ReMapp sent Comfort Keyboard a pro forma invoice indicating a total order in the amount of $46,650.00, with a balance due of $22,535.00, representing 50% of the cost for 2000 keyboard Hub Assembly (HUB). (Exhibit 1013.) This was followed by a formal invoice dated September 9, 2006, seeking full payment of $58,350.00 for the 2000 HUBs and related charges. (Exhibit 1014.) A second page of this document is a second invoice seeking payment of $45,150.00 for 2,000 USB keyboards. (Exhibit 1014.)

During the summer of 2006, ReMapp and Comfort Keyboard frequently corresponded by way of email. ReMapp repeatedly contacted Comfort Keyboard requesting prompt payment for the products ordered and for clarification of certain technical information. (See, e.g., Exhibits 4, 5, 6, 7, 8, 29, 33, 34, 38, 45, 1002, 1006.) Comfort Keyboard answered ReMapp's technical questions but did not send the payments requested. (See, e.g., Exhibits 21, 35.)

3

On August 29, 2006, Comfort Keyboard sent an email to ReMapp complaining that "almost 50%" of the foot pedals that ReMapp shipped were failing. (Exhibit 1009.) Comfort Keyboard states, "We paid for these in full, and you promised me that they will be 100% tested, [sic] How can they be failing if they are 100% tested.[sic]" (Exhibit 1009.)

Finally, on September 26, 2006, Comfort Keyboard sent an email to ReMapp stating that its investors wanted it to use a different manufacturer and that they had received a shipment from a new supplier and would prefer to use this new supplier instead of ReMapp. (Exhibit 45.) According to the evidence, Comfort Keyboard does not have any investors, but is wholly owned by Afifi. (Tr. 113.) ReMapp replied to this email stating that it understood that Comfort Keyboard had the right to change suppliers but reiterated that Comfort Keyboard still owed for the products it had ordered. (Exhibit 45.)

**CONCLUSIONS OF LAW**

As a preliminary matter, the defendant raised an issue regarding the authenticity of certain emails received as exhibits during trial. The defendant testified that he never sent certain emails that were attributed to him. In response, the plaintiff noted that at the final pretrial conference the parties stipulated that there were no disputes regarding the authenticity of any proposed exhibits.

It is standard practice for this court to inquire during a pretrial conference whether there are any disputes regarding authenticity of any exhibits in order to prevent a party from, for example, unnecessarily subpoenaing a custodian of records to testify as to authenticity. The defendant argues that this is not dispositive because the stipulation regarding authenticity was intended to simply satisfy Federal Rule of Evidence 901, i.e. "that the matter in question is what its proponent claims."

The court need not decide whether or not the pretrial conference stipulation is dispositive. Based upon the evidence presented, the court rejects the defendant's contention that the emails

4

purported to be from Afifi are forgeries. The court is persuaded that the emails attributed to Afifi were sent by Afifi.

Afifi argues that certain emails were fabricated because in some of the emails, the signature portion, which includes a Comfort Keyboards logo, is missing, (see, e.g., Tr. 129; Exhibit 9), or in a different font, (see, e.g., Tr. 130; Exhibit 19). Specifically, he points to the fact that in certain emails, rather than the Comfort Keyboards logo appearing, a box for it appears with a smaller box inside it and an "X" appearing in that smaller box. (See, e.g., Exhibit 9.) Afifi testified that the appearance of these boxes in place of the Comfort Keyboards logo, which is an image file embedded in the email, indicates that a person tried to copy the logo, but was unsuccessful. (Tr. 159-60.)

No expert testimony is needed for the court to know that images frequently do not properly display in email messages or on web pages, either because of security settings or any number of other reasons, and in the place of these blocked images, the same sort of boxes and "X" appear. The court finds it unlikely that Afifi, the owner of a computer peripheral manufacturing company with a degree in computer science, who regularly uses email in his business, would not also possess such common computer knowledge. Thus, the court finds that Afifi's testimony that the appearance of these boxes and "X" must be indicative of an unsuccessful forgery is not credible.

As for the discrepancies in the font size, again, the court is well aware that any number of factors may determine how an email displays. For example, Exhibits 3 and 1002 are two copies of the same email that are printed in distinct fonts. Further, Exhibit 1009 has the same smaller logo that Afifi alleges is indicative of a forged email, but nonetheless Afifi acknowledges this to be an email he sent. (Tr. 138.) When questioned as to why this logo appeared different, Afifi could offer no explanation. (Tr. 138.) Therefore, it is the conclusion of the court that Afifi sent all messages attributed to him in the record.

5

ReMapp's Claims

Turning to the substantive dispute between the parties, this matter involves the sale of goods between sophisticated parties and therefore Wisconsin's codification of the Uniform Commercial Code applies. See Wis. Stat. § 402.101 et. seq. Because the sale of goods was in excess of $500.00, a writing is required. Wis. Stat. § 402.201(1). However, a written contract is not required if the goods were specially manufactured for the customer. Wis. Stat. § 402.201(3)(a).

The court finds that the evidence clearly establishes that the USB keyboard and HUB circuit boards were custom manufactured for Comfort Keyboard and these products are not suitable for sale to others in the ordinary course of ReMapp's business. The record is replete with discussion of how these circuit boards had to be custom designed for Comfort Keyboard's use.

The court further finds that an oral contract existed between ReMapp and Comfort Keyboard for Comfort Keyboard to purchase 2,000 USB keyboard circuit boards at a price of $21.65 each for a total cost of $43,300.00. (Exhibit 1014 at 2.) Additionally, the court finds that an oral contract existed between ReMapp and Comfort Keyboard for Comfort Keyboard to purchase 2,000 HUB circuit boards at a price of $23.60 each for a total cost of $47,200.00. (Exhibit 1014 at 1.) Each of these orders also contain an assembly engineering charge of $270.00 per order. (Exhibit 1014.)

A further analysis of each invoice discloses a $0.79 per unit charge for freight. (Exhibit 1014.) The court finds this is an inappropriate charge to Comfort Keyboard, because the undisputed evidence establishes that the products were never shipped and remain in China. See Wis. Stat. § 402.708(1) (Sellers recovery for buyer's breach does not include "expenses saved in consequence of the buyer's breach.") Therefore, this charge is not one to which ReMapp is entitled. Further, Exhibit 1014 contains other charges not adequately explained in the record. Because the plaintiff has failed to demonstrate the nature of these charges, the court finds that the plaintiff has failed in its burden of demonstrating that these are damages to which it is entitled.

Similarly, the record clearly demonstrates that an oral contract existed between ReMapp and Comfort Keyboard for the purchase of 4,100 processors to be used in the manufacture of the circuit boards ordered by Comfort Keyboard. However, unlike the circuit boards, the record establishes that these processors were not custom manufactured for Comfort Keyboard. Rather, these processors are standard components used by numerous manufacturers in a variety of products. If these processors had been attached to the final circuit boards, the cost would likely be recoverable as essentially a materials cost in the manufacture of the custom designed product. However, Edmonds testified that these processors had yet to be attached to the circuit boards. (Tr. 61.)

Therefore, although ReMapp is not entitled to recover its costs for these processors pursuant to Wis. Stat. § 402.201(3)(a), the court finds that the transaction between ReMapp and Comfort Keyboard nonetheless falls within the exception set forth in § 402.201(2), which states:

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of sub. (1) against such party unless written notice of objection to its contents is given within 10 days after it is received.

ReMapp sent Comfort Keyboard an invoice dated July 19, 2006 for the 4,100 processors. (Exhibit 1015, at 2.) Comfort Keyboard never responded with any objection within 10 days after it received this notice. Therefore, in light of this invoice and the oral agreement between the parties, the court finds that an enforceable contract existed between the parties. Thus, ReMapp has established that Comfort Keyboard entered into a binding contract for 4,100 processors at a price of $5.85 each for a total of $23,985.00. (Exhibit 1015 at 2.)

In summary, ReMapp has proven by a preponderance of the evidence that Comfort Keyboard entered into binding contracts for the purchase of 2,000 USB keyboard circuit boards at a price of $21.65 each for a total cost of $43,300.00, (Exhibit 1014 at 2), 2,000 HUB circuit boards at a price of $23.60 each for a total cost of $47,200.00, (Exhibit 1014 at 1), and 4,100 processors at

7

$5.85 each for a total cost of $23,985.00, (Exhibit 1015 at 2). Additionally, ReMapp has proven that Comfort Keyboard is obligated to pay $270.00 per circuit board order for engineering costs.

ReMapp has failed to prove by a preponderance of the evidence that it is entitled to recover for invoice numbers 5COM16rev-0906 or 5COM17-0906, which are also listed on Exhibit 1. The court has received insufficient evidence regarding the facts surrounding any agreement between the parties related to these invoices. Further, according to the statement, these invoices contain certain partial payments and credits that were not adequately explained at trial. Finally, ReMapp has failed to adequately explain the price adjustments contained on Exhibit 1014, and therefore the court finds that ReMapp is not entitled to recover for these items.

Totaling the numbers for which ReMapp has furnished sufficient proof equals $115,025.00. However, in its complaint and its post-trial briefs, ReMapp seeks only $110,091.54. This discrepancy appears to be the result of an unexplained variance between Exhibit 1 and the individual invoices. Exhibit 1, ReMapp's statement to Comfort Keyboard regarding Comfort Keyboard's outstanding balances reflects a balance owed of $46,650.00 on invoice number 5COM18-0906 (invoice relating to the 2000 HUBs, (Exhibit 1014)), $33,450.00 on invoice number 5COM19-0906 (invoice relating to the 2000 USB keyboards, (Exhibit 1014 at 2), and $23,985.00 on invoice number 5COM20-0719 (invoice relating to the 4,100 processors, (Exhibit 1015 at 2)).

Therefore, in view of the court's conclusion that ReMapp is not entitled to certain items contained on Exhibit 1014, the court shall also deduct these unexplained amounts from the figures utilized on Exhibit 1 for invoice number 5COM18-0906 ($46,650.00 minus $2,300.00 minus $2,400.00 minus $4,600.00 equals $37,350.00). Additionally, as discussed above, the court shall subtract the $0.79 freight charge for each of the 4,000 circuit boards ordered. Thus, the total amount ReMapp has proven Comfort Keyboard agreed to pay is $91,625.00 ($37,350.00 minus

8

$1,580.00 for freight equals $35,770.00 for 5COM18-0906 plus $33,450.00 minus $1,580.00 for freight equals $31,870.00 for 5COM19-0906 plus $23,985.00 for 5COM20-0719).

That does not end the matter of recoverable damages since ReMapp has not established that it is entitled to this full amount. ReMapp seeks recovery pursuant to Wis. Stat. § 402.709(1)(b). (Docket No. 36 at 3.) This provision permits a seller to recover the contract price for goods "if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing." The record is devoid of ReMapp making any effort to mitigate its damages by attempting to resell any of the products Comfort Keyboard ordered. Nonetheless, the record demonstrates that the 4,100 processors are valuable to ReMapp and may be utilized in other products or resold. The record is clear that the value of these processors fluctuates and thus these processors may have even appreciated in value. However, at a minimum, the record establishes that these processors are worth $5.85 each and may be readily resold at that price. Since ReMapp has failed to show that it is unable to resell these processors at a reasonable price, and the record indicates that these processors may be readily resold at the full price ReMapp paid, ReMapp is not entitled to recover anything from Comfort Keyboard for these 4,100 processors. ReMapp has failed to mitigate its damages and is thus precluded from recovery from Comfort Keyboard for 5COM20-0719.

As for the 4,000 custom manufactured circuit boards, the record is clear that these could not be resold to another manufacturer. Nonetheless, Edmonds testified that these circuit boards could be resold for about $0.10 per pound as scrap. (Tr. 14-15.) Edmonds testified that five circuit boards weigh "less than two pounds." (Tr. 15.) Based upon the court's review of the circuit boards with attached components that the court received into evidence, (Exhibits 11A, 11B, 12, 13, 14), the court considers one-pound an appropriate estimated weight for these five boards. Therefore, the 4,000 circuit boards are worth approximately $80.00 as scrap (4,000 divided by 5 and then

9

multiplied by $0.10 equals $80.00). Thus, ReMapp is entitled to recover from Comfort Keyboard the sum of $35,770.00 for 5COM18-0906 plus $31,870.00 for 5COM19-0906, minus $80.00 for the scrap value of these boards, for a total of **$67,560.00**.

Comfort Keyboard's Counterclaim

Finally, there is the issue of Comfort Keyboard's counterclaim. The parties paid scant attention to this at trial or in their post-trial briefs. Comfort Keyboard claims that it received 950 defective foot pedals at $4.80 each; 300 defective circuit boards at $23.00 each; and 3,000 incorrect cables at $0.51 each. (Docket No. 31 at 9.) Comfort Keyboard seeks full reimbursement for these allegedly defective products. Comfort Keyboard has established that it received certain products that were defective. (See, e.g., Exhibit 1 (stating $330.00 credit for "USB Cable adjustment), Exhibit 2 (discussing defective foot pedals), Exhibit 1009 (discussing defective foot pedals) see also Tr. 73 (Edmonds acknowledging that certain foot pedals were mis-wired), Tr. 120 (Afifi testifying about problems with circuit boards), Tr. 108-11 (Yer Thao testifying about repairs done to circuit boards.))

Although Comfort Keyboard has proven that it received certain defective products, it has failed to establish by a preponderance of evidence both the quantity of defective products it received and its cost relating to these defective products. All of the testimony that the court received regarding the quantities of defective foot pedals and circuit boards was in the form of approximations. Afifi testified he has "about 150" unusable USB boards, (Tr. 121), and later testified that he "still [has] about 150 of these and 150 of the PS2's, so I still have about 300 units," (Tr. 138). As for the defective foot pedals, Afifi testified, "Out of 2700 pieces, . . . I have right now in my warehouse almost 950 pieces that have failed." (Tr. 126.) Yer Thao, a former employee of Comfort Keyboard's, testified that she worked on "a lot" of circuit board adding a missing resistor. (Tr. 110.) When asked what "a lot" is, she replied that she made "like about 15 to 10 keyboards a

10

day." (Tr. 110.) It is unclear whether this answer was even responsive to the question before her, in light of the fact that she asked a question about how many defective circuit boards she repaired with an answer of how many keyboards she made per day.

Although, Afifi did offer more definitive testimony regarding the quantity of the defective boards, responding, "That is correct," to his attorney's question, "So you have 300 boards that you currently have at $23 each; is that right?" the court finds in light of Afifi's prior equivocation, this subsequent statement is insufficient to sustain Comfort Keyboard's burden of proof.  Even the dollar value that Comfort Keyboard attaches to each defective circuit board appears to be an approximation. The court has been unable to locate anywhere in the record a circuit board costing an even $23.00; rather, circuit boards vary in cost, for example, $13.98, $13.75, $12.95, and $20.00 for PS2's, (Exhibits 1029, 1030, 1023, 1019 at 2, respectively), (PS2s are a portion of the circuit boards Afifi alleges were defective), $14.75, $14.91, $7.40, $22.80, $20.74, $7.40, $20.74, and $20.80 for USB keyboards (Exhibit 1030 at 1, 1023, 1022 and 1024, 1011, 1020, 1017, 1021, 1037, respectively), and $24.45, and $23.60 for HUBs (Exhibit 1036 and 1032, 1020 at 2, respectively).

Further, in the court's opinion, Afifi is prone to a bit of exaggeration when it comes to failure rates. For example, he wrote in an email to ReMapp regarding the failure rate of the foot pedals that "almost 50% of them are failing." (Exhibit 1009), but now seeks payment for 950 out of 2700, which is obviously far short of 50%. The only other indication of a failure rate the court received is in Exhibit 2 where Afifi wrote that there were 11 defective foot pedals out of the first 100, a failure rate that was acceptable to Afifi.

Approximations by a party that bears burden to prove damages are insufficient for the court. A party cannot simply estimate its damages but rather must prove damages by a preponderance of the evidence. By offering only approximations, Comfort Keyboard has failed to sustain its burden.

Case 2:07-cv-00287-AEG   Filed 08/13/08   Page 11 of 13   Document 37

Additionally, even if Comfort Keyboard could provide a hard number of the units it received that were defective, it has failed to establish damages with the requisite specificity. The evidence indicates that the foot pedals and the circuit boards could be repaired, so the appropriate remedy would not be full reimbursement for each defective item, but rather, the costs of repair. However, no evidence has been presented as to what it would cost to repair each defective unit. And thus, in this regard, Comfort Keyboard has again failed in its burden of proof. Therefore, the court shall deny Comfort Keyboard's counterclaim with respect to the defective foot pedals and circuit boards.

On the other hand, the court finds that Comfort Keyboard has sustained it burden with respect to its counterclaim for breach of contract regarding the 3,000 unshielded cables it received from ReMapp. The record is undisputed that Comfort Keyboard ordered shielded cables and instead received unshielded cables. ReMapp attempted to resolve this by crediting Comfort Keyboard the difference in cost between the shielded cable it ordered and the unshielded cable it received. The court finds this remedy inappropriate; there is nothing to indicate that Comfort Keyboard has any use for unshielded cable. (See Tr. 118.) Additionally, it is not as if unshielded cable can somehow be turned into shielded cable for the $330.00 ReMapp offered to credit Comfort Keyboard. Should a customer in a restaurant who orders a steak be satisfied if a hamburger is received instead, and the manager says that the customer will be credited the difference between the two items? That might be acceptable, but only if the customer decided that the hamburger would satisfy his gastronomical desire. In the case before the court, the customer wanted steak and not hamburger. Afifi testified that he had no use for the unshielded cable. (Tr. 118-19.) Afifi testified that he ordered 3,000 cables. (Tr. 119; see also Exhibit 1026.) Therefore, the court finds that Comfort Keyboard is entitled to recover **$1,530.00** for the 3000 cables that it paid $0.51 per cable for on the basis that ReMapp breached the contract between the parties for shielded cable by sending Comfort Keyboard unshielded cable.

**IT IS THEREFORE ORDERED** that, for the reasons set forth above, the Clerk shall enter judgment as follows:

(1)     Judgment shall be entered in favor of ReMapp and against Comfort Keyboard on ReMapp's breach of contract claim, in the amount of **$67,560.00, together with its taxable costs**.

(2)     Judgment shall be entered in favor of Comfort Keyboard and against ReMapp on Comfort Keyboard's counterclaim, in the amount of **$1,530.00, together with its taxable costs**.

Dated at Milwaukee, Wisconsin this <u>13th</u> day of August 2008.

s/AARON E. GOODSTEIN
U.S. Magistrate Judge

Case 2:07-cv-00287-AEG   Filed 08/13/08   Page 13 of 13   Document 37